SECURITIES AND EXCHANGE COMMISSION, Appellant,

v.

Arthur Howard BLOOMBERG et al., Trustees, et al., Appellees.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, Appellant,

v.

Arthur H. BLOOMBERG et al., Defendants, Appellees.

Nos. 5907, 5908.

United States Court of Appeals
First Circuit.

Feb. 6, 1962.

Walter P. North, Asst. General Counsel, Washington, D. C., with whom Peter A. Dammann, General Counsel, and Robert L. McCloskey, David Ferber, Associate General Counsel, Securities and Exchange Commission, Washington, D. C., were on brief, for appellant.

Arthur Howard Bloomberg and Warren F. Farr, Boston, Mass., with whom Sidney J. Kagan, Peter F. Coogan, Fred B. Lund and John Bok, Boston, Mass., were on brief, for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

The Securities and Exchange Commission appeals from two adverse judgments of the District Court of the United States for the District of Massachusetts which stem from the Commission's efforts to compel registration of certain stock of the Bettinger Corporation, a Massachusetts Corporation, which was being offered to its present share-holders pursuant to a plan of reorganization.

On November 28, 1960 the Bettinger Corporation filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. On March 6, 1961 the corporation amended this petition to request reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. This amended petition was approved on March 13, 1961 after a hearing at which counsel for the Commission was present. Thereafter, trustees were appointed and on July 10, 1961 they filed a Plan for the reorganization of the corporation.

In the proposed Plan was a provision which would afford an opportunity to holders of old common stock to exchange their present shares at the rate of one share of old common stock plus $3.00 for a share of new common stock up to 100,000 shares. Holders of old preferred stock were given a similar opportunity to exchange their stock at the ratio of one share of old preferred stock plus $6.00 for two shares of new common stock. After describing such exchanges, the Plan contained the following language: "(All such exchanges of shares are exempt under Section 264 [sub.]

a(2) of the Bankruptcy Act from the provisions of the Securities Act of 1933)." This legend obviously reflected the opinion of the trustees that the securities to be issued to present shareholders of the corporation would be exempt from the registration requirements of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq. Petitions for determination that the corporation and its wholly owned subsidiary were insolvent were filed simultaneously with the Plan.

On July 26, 1961 a hearing was held on the approval of the Plan. The Commission was represented at this hearing and informed the court that in the opinion of its Division of Corporation Finance no exemption would be available for the proposed stock under Section 264, sub. a(2) of the Bankruptcy Act. This position was predicated on the premise that the proposed transfer of new stock for old (plus the payment of cash) could not be regarded as an "exchange" within the statutory language of this section.

Under the Commission's view, since the corporation was insolvent there was no equity left for the common stockholders and consequently they, in effect, were giving up nothing of value by transferring their present stock back to the corporation. In sum, it was the Commission's position that the only meaningful consideration for the new shares would be the cash payment and, consequently, the stock should be regarded as a new issue subject to registration under the Securities Act of 1933 and not as an "exchange" under the alleviating provisions of Section 264, sub. a(2) of the Bankruptcy Act.

However, before giving the Commission's position on the proposed issuance, its attorney prefaced his remarks to the district judge thusly: " * * * What I have to say is not in opposition to the plan but merely to relate to the Court the position of the Division of Corporation Finance regarding one of the provisions in the plan, particularly the provision dealing with the offering of 100,000 shares to the existing shareholders at $3 a share.

"The plan admittedly does not contemplate the registration with the SEC of these 100,000 shares." Following the exposition of the Commission's position, counsel for the debtor corporation addressed the court at length on the question of why the proposed issue should be regarded as an "exchange" and, thus, exempt from the registration requirements.

On the following day, July 27, 1961, the court approved the Plan as submitted by the trustees. Although the order of approval contained no express finding as to whether the stock to be issued was exempt from registration, the assertion that the exchange was exempt remained in the Plan as approved.

The trustees, thereupon, promptly submitted the Plan to the creditors. On August 18, 1961 copies of the Plan, together with a letter from John Bottomly, the president of the corporation, and an acceptance form were mailed to each stockholder. The Plan was well received and exchange offers relating to approximately 127,000 shares of common stock were received by the escrow agent.

On September 8, 1961 the Commission filed a motion for leave to intervene in the reorganization proceedings "in order to insure compliance with the registration provisions of the Securities Act of 1933." There was attached to this motion to intervene a motion for an order directing the trustees to file a registration statement. On September 18, 1961 following a hearing, the motion to intervene was denied.

On September 22, 1961 the Commission filed a complaint against the trustees and the president of the corporation (Bottomly) seeking a preliminary injunction restraining the defendants from selling the new common stock of the reorganized corporation in violation of Section 5 of the Securities Act of 1933. On October 2, 1961 at the hearing on this complaint, the trustees moved to dismiss on the ground that the Commission had failed

to obtain leave of the reorganization court to sue the trustees. Bottomly made an oral motion to dismiss at this hearing.

On October 6, 1961 "without acknowledging that leave to sue is required," the Commission filed a motion in the district court for leave to file its complaint for an injunction, *nunc pro tunc*. On October 16, 1961 this motion was denied and the motions to dismiss were granted on the following day. On October 18, 1961 the district court entered an order reflecting its rulings on October 16 and 17, 1961, denying the motion of the Commission for leave to file suit, and dismissing the complaint. On October 31, the court filed a memorandum opinion setting forth its reasons for both the October 16 and 17 orders and for the earlier order of September 18 denying the Commission's intervention in the Chapter X proceedings.

On October 9, 1961 a hearing on confirmation of the Plan was held and on October 16 the Plan was ordered confirmed by an order which set October 19 as the effective date of the Plan. On that date the trustees turned over the business to the reorganized corporation.

Although prosecuted separately, these two appeals arise from the actions of the Commission in attempting to raise the single issue of whether the new stock should be registered. Our disposition of the case permits a similar consideration.

The district judge based his denial of intervention upon the grounds that (a) the time requirements of registration would have frustrated the entire plan of reorgnization since the corporation was in urgent need of new working capital which would be only available in time to save the corporation if the Plan were confirmed and consummated without the delays incident to registration and (b) that the Commission was dilatory in failing to take affirmative action to block issuance of the stock before September 8. As the court put it: "Why the Commission, with full knowledge of the contents of the proposed and approved plan, remained inactive in this matter from July 27 until September 8, when it suddenly sprang into action, has never been explained to the court."

The Commission's motion to intervene was denied "as a matter of discretion and as a matter of law." The motion for leave to file suit against the trustees was denied as a matter of discretion.

■■ We do not agree with any language of the court which might be construed as indicating that an issue of stock—otherwise subject to registration—could be excused therefrom on the basis that the time requirements of the registration procedure would be inimical to a proposed plan of reorganization. However, we do believe that the district court properly exercised its discretion in denying the Commission's actions because of their untimely prosecution.

Here the Commission contends that the district judge utilized an improper time standard in making his determination of timeliness. The court based its determination on the fact that the Commission remained quiescent "for over forty days" after it had approved the Plan. This calculation was predicated upon the time which elapsed between the entry of the court's order approving the Plan on July 27 and the filing of the Commission's motion to intervene on September 8.

It is the Commission's position that since the order which the Court entered on July 27 did not expressly rule on whether the stock had to be registered, the Commission had no occasion to go to court at that point. It contends that the first overt act which put the Commission on notice that there would be an attempt to issue the stock without registration occurred on August 18th, the day on which the old stockholders were solicited by mail to subscribe to the new stock.

If we were to accept the Commission's position that it could not be charged with notice—and thus expected to act—until its receipt of the letter to the Bettinger stockholders, then it might fairly be said that the record reflects that the Commission acted with due expedition. However,

to accept this contention it is necessary that we conclude that during the interim period the Commission had no reason to believe that the trustees were proceeding to issue the Bettinger stock without registration. However, such a conclusion would require a strained interpretation of the record before us.

As early as March 1961 the Commission had written notice that the Bettinger Corporation would seek to avoid registration of any stock which might be issued in a reorganization. The petition which sought to transfer the proceedings from an arrangement under Chapter XI of the Bankruptcy Act to a reorganization under Chapter X contained the following language in support of the requested amendment: " * * * Chapter XI does not permit a change in the rights of stockholders and does not provide an adequate exemption from the provisions of section 5 of the Securities Act of 1933. * * * " That petition also contained the statement that "1. The Debtor is insolvent."

On July 10, 1961 the Commission was sent a copy of the proposed Plan which plainly expressed the opinion that the exchange of shares would be exempt from the registration requirements of the Securities Act of 1933. At the hearing on July 26, the Commission evinced no doubt as to the trustees' position in this regard. Its counsel pointed out to the court that: "The plan admittedly does not contemplate the registration with the SEC of these 100,000 shares." That this was the intention of the trustees and that they were not disposed to recede from this purpose should have been unmistakably clear to the Commission in the light of the forceful argument for non-registration, which the attorneys for the debtor corporation made following the Commission's presentation.

On the following day the court approved the Plan as submitted by the trustees without modification. To be sure this order did not contain an express finding as to whether the stock to be issued was exempt from registration but in approving the Plan *in toto*, the court must have necessarily approved its provisions and one of these provisions contained the unequivocal language that the subject stock would be exempt from the registration requirements.

In the context of this course of events it is extremely difficult for us to accept the Commission's position that, despite the approval of this order, it had no reason to believe that the trustees would actually attempt to issue the questioned stock without registration. At oral argument, the Commission contended that so far as it knew, the trustees might well have been preparing to register the stock in the period between July 27 and September 8 and until the Commission received a copy of the Bottomly letter they were aware of "no overt act" to the contrary. We believe that such a position is totally unrealistic.

From the outset the trustees' position was clear and unvarying. One of the chief reasons they amended the proceedings from an arrangement under Chapter XI to a reorganization under Chapter X was to gain the exemption from registration. The proposed plan which they submitted carried the statement that the shares would be exempt from registration and this was their avowed and unflinching position at the hearing on approval. Thereafter the Plan was approved in its entirety. To contend that the Commission could reasonably believe that the trustees would thereupon do an abrupt "about face" strains belief.[1]

We believe that at this point—with the court's approval of the proposed Plan —the Commission must be deemed to have been on fair notice that the trustees would proceed to issue the stock without registration. If the Commission felt that the stock should have been registered and its position in this regard was apparently firm at least by the date

---

[1]. The record reflects that it would have required at least five or six months to accomplish the registration.

of the hearing on July 26, then it was at this point that it should have acted to obtain such a result. Once it can be fairly implied that the entry of an order is adverse to the position for which the Commission contends, it is from this point that the timeliness of the Commission's actions to challenge the result will be assessed.

Here for forty days the Commission stood mute and took no action whatsoever until, as the court below pointed out, "action by creditors and the shareholders on the plan was in full swing." During this period there had been substantial reliance upon the order of approval and the Plan was swiftly proceeding to consummation.

 One of the requirements of Rule 24 of the Federal Rules of Civil Procedure, 28 U.S.C.A. made applicable to bankruptcy proceedings by Order 37 of the General Orders in Bankruptcy, 11 U.S.C.A. following section 53, is that an application for permission to intervene must be "timely." The determination of whether a petition is timely involves various competing considerations, not the least of which is whether the applicant was in a position to seek intervention at an earlier stage. See, e. g., American Brake Shoe & Foundry Co. v. Interborough Rapid Transit Co., 112 F.2d 669 (2 Cir. 1940); Mullins v. DeSoto Securities Co., 2 F.R.D. 502 (W. D.La.1942), appeal dismissed 136 F.2d 55 (5 Cir. 1943). We believe that in this case with the position of the Commission already firm and having brought the implications thereof to the attention of the court at the July 26 hearing, it was clearly in a position to seek—and in our view should have sought—intervention long before September 8. Procrastination is never admirable; where, as here, the fate of a corporate reorganization hangs in the balance, it is intolerable. Thusly viewed, we cannot say that the district court abused its discretion in denying the Commission's motion to intervene.

The same considerations are equally applicable to the motion for leave to sue, which was also addressed to the court's discretion. The Commission has frankly admitted that its purpose in bringing the second suit was "a second attempt to raise the same issue which would have been decided had the intervention been granted." However, since the court had already decided that the testing of the question of registration was foreclosed as untimely, one path was as forbidden as the other. As we recently observed, in a different context, in Greenberg v. United States, 295 F.2d 903, decided November 7, 1961, "It is just as bad to back up a forbidden path as it is to walk up it."

Judgments will be entered affirming the orders of the district court.