615 F.2d 1265
 22 Fair Empl.Prac.Cas. 1053,
22 Empl. Prac. Dec. P 30,806
Ann Cooney MOORE et al., Plaintiffs-Appellees,
v.
The CITY OF SAN JOSE; San Jose Police Department; Ted
Tedesco; ClintonHilliard, Defendants,
and
San Jose Peace Officers' Association, Defendant-Intervenor-Appellant.
 Nos. 77-2874, 77-3087.
 United States Court of Appeals,
Ninth Circuit.
 April 1, 1980.
 
 Ronald Yank, Carroll, Burdick & McDonough, San Francisco, Cal., for san jose.
 Jacqueline Stewart, Wylie, Blunt & McBride, San Jose, Cal., Willie Lott, Jr., Oakland, Cal., for Moore.
 Lutz Alexander Prager, Washington, D. C., for amicus curiae.
 Appeal from the United States District Court for the Northern District of California.
 Before DUNIWAY and ANDERSON, Circuit Judges, and GRANT,* District Judge.
 DUNIWAY, Circuit Judge:
 
 
 1
 These are appeals from a judgment of the district court approving as "fair, reasonable and adequate" a settlement agreement (the Agreement) between the fourteen named plaintiffs (the Assistant Policewomen) and the original defendant, the City of San Jose, but opposed by the intervenor, the San Jose Peace Officers' Association (the Association), and dismissing all claims by the Assistant Policewomen against the Association and all cross claims by the Association against San Jose. In No. 77-3087, the Assistant Policewomen attack the district court's dismissal of their claims against the Association, including their claim for attorneys' fees. In No. 77-2874, the Association attacks the district court's dismissal of its claim against San Jose and its upholding the Agreement insofar as it grants retroactive seniority to the Assistant Policewomen. The Association also claims that the approval of the Agreement was error because the Assistant Policewomen's claims were barred by the statute of limitations.
 
 
 2
 We affirm the district court on all points.
 
 
 3
 I. The Facts.
 
 
 4
 This case was filed in 1975 as a class action alleging that San Jose had violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (Supp. V, 1975), the Equal Pay Act, 29 U.S.C. § 201 et seq., and San Jose's affirmative action plan, by discriminating against the women in the assistant policewoman job classification, by maintaining sex-segregated job classifications, and by paying the assistant policewomen less than it paid men in the police officer job classification. Later, the class action allegations were stricken and thirteen additional assistant policewomen joined the suit as named plaintiffs, after having filed charges with the Equal Employment Opportunity Commission in 1976.[1] The Association was allowed to intervene for the limited purpose of contesting the fairness of a settlement of the charges reached by the Commission, the Assistant Policewomen and San Jose, which was presented to the court in settlement of all of the Assistant Policewomen's claims against San Jose. The Association filed suit in state court to prevent implementation of that agreement. San Jose and the Association agreed to a temporary restraining order to prevent such implementation.
 
 
 5
 In September, 1976, the Assistant Policewomen filed supplemental pleadings joining the Association as a defendant, alleging that it had violated Title VII and the Equal Pay Act, and had breached both its duty of fair representation and the nondiscrimination clause of its negotiated contract with San Jose. The Assistant Policewomen requested equitable relief, back pay and attorneys' fees from the Association. The Association filed a cross-complaint against San Jose to prevent implementation of the settlement agreement.
 
 
 6
 In 1977, the Commission, San Jose and the Assistant Policewomen negotiated a new settlement agreement, the one ultimately approved. Under the terms of the Agreement, the Assistant Policewomen are to be appointed to the police officer job classification, and must satisfactorily complete the training required of police officers. Their seniority as police officers will date from their appointment as assistant policewomen. Some of the Assistant Policewomen's seniority dates pre-date March 24, 1972, the date Title VII became applicable to public employers.
 
 
 7
 After hearing extensive evidence from 28 witnesses and reviewing 57 exhibits, the district court concluded that the Agreement was fair, reasonable and adequate and that its implementation would not have a significant adverse impact on the incumbent police officers. In support of these conclusions, the court found that San Jose had discriminated against the plaintiffs both before and after 1972. It also found that the Association was not a party to such discrimination. It entered a judgment incorporating the settlement of the Assistant Policewomen's Title VII claims against San Jose and dismissing all remaining claims among the Assistant Policewomen, San Jose and the Association.
 
 
 8
 The Association moved for reconsideration and amendment of the judgment and for an injunction restraining implementation of the Agreement in light of the intervening decision of International Brotherhood of Teamsters v. United States, 1977, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (hereafter Teamsters ). The district court denied the motion.
 
 
 9
 The evidence received at the hearing relating to San Jose's employment practices showed the following: Before 1973, the police officer job classification was exclusively male.[2] The first woman was appointed a police officer in that year, but remained the only woman in that classification until 1976. As of 1977, there were only 12 women out of approximately 587 police officers. Before these appointments of women to police officer positions, women were hired and assigned only to the identification officer classification, and after its elimination, to the assistant policewoman classification. As recently as 1975, city publications referred exclusively to men in speaking of job eligibility for police officers.
 
 
 10
 The identification officer classification (ID officers) was exclusively female, with the exception of one male incumbent. He was later appointed a police officer with the assistance of the Association, upon waiver of some of the usual entrance requirements for that position, including the physical agility test. The women ID officers were uniformed, gun-carrying sworn personnel who performed a combination of police and clerical duties. They were virtually the only women members of the sworn police force.
 
 
 11
 In September, 1970, the 26 women ID officers were reclassified to a new civilian position identification technician (ID technician) and their salaries were frozen. At the same time, a new position assistant policewoman was created. Originally, nine of these positions were available to be filled by examination from the ranks of the ID technicians (former ID officers). Assistant policewomen are sworn, uniformed, weapon-carrying police personnel performing tasks essentially the same as those performed by the ID officers. The district court found that their work was not substantially the same as that of police officers. Since its creation, the assistant policewoman position has been held only by women, and has been considered an entry-level position with promotion to a policewoman classification but not to the separate entry level police officer classification.
 
 
 12
 In 1973, San Jose and the Assistant Policewomen reached an agreement to provide access for them to police officer positions by modifying or waiving some of the usual entrance requirements.[3] Four of them attempted to become police officers under the terms of this agreement but none was successful at least two of them were not able to pass the physical agility test.
 
 
 13
 The Association became the exclusive bargaining agent for sworn police personnel in 1969. It represented the ID officers before the elimination of that classification and it later represented the assistant policewomen. Before the first collective bargaining agreement, "seniority" (normally from the date of appointment) within a job classification determined the order of choice for assignment to particular shifts, beats, days-off, supervisors and vacations, but did not affect either earnings or promotions. The first and subsequent collective bargaining agreements do not mention this use of seniority, but contain a "zipper clause" providing that existing practices and benefits not referenced in the collective bargaining agreement will continue without change unless modified by mutual agreement of the parties.
 
 
 14
 The Agreement reached in settlement of the Assistant Policewomen's Title VII claims against San Jose provided that the Assistant Policewomen would be assigned to the police officer job classification, with seniority dating from the date of their appointment as assistant policewomen. The usual college credit requirement and age limitations for appointment as a police officer were waived, but each of the named plaintiffs is required to satisfactorily complete the training required of all police officers and, within five years of her appointment to complete the requisite number of college credits.
 
 
 15
 The district court found that the Agreement would not result in any deterioration of employment standards, because all the women were required to complete the same training as new police officers. It found insignificant the effect of waiving or adjusting the usual age limitations, noting that "the City's past discrimination has been partially responsible for excluding women from police officer jobs until they passed the age limit and until it became difficult for them to pass the agility test."[4]
 
 
 16
 The district court also found that the effect of the seniority provisions of the Agreement would be minimal because the number of women involved is so small (12) in relation to the total number of police officers (590) that the impact of seniority adjustments would be diffused.
 
 
 17
 II. Adequacy of District Court Review to Approve Settlement.
 
 
 18
 The Association approaches this case as if it were appealing from a judgment entered after the resolution of a fully contested and litigated Title VII case rather than from a judgment approving a settlement of Title VII claims against San Jose, agreed to by the Assistant Policewomen and the city. The Association claims that the findings of the district court are inadequate to support a conclusion that the Assistant Policewomen were the victims of discrimination, that the district court inadequately considered the effects of the Agreement on incumbent employees and that the conclusion of the district court that such effects would be minimal is unjustified. It also claims that these inadequacies render void the district court's approval of the Agreement as fair, adequate and reasonable. The claims of the Association are without substance.
 
 
 19
 In enacting Title VII, Congress has specifically endorsed voluntary compliance and settlement as the preferred means of achieving the elimination of unlawful employment discrimination. Alexander v. Gardner-Denver Co., 1977, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147. The principles favoring negotiated settlements in general, and especially in Title VII cases, dictate that the merits of the underlying claims will remain unresolved.
 
 
 20
 The sole question before the district court in reviewing a settlement agreement is whether the agreement is fundamentally fair or just. See Mandujano v. Basic Vegetable Products, Inc., 9 Cir., 1976, 541 F.2d 832, 835, 836. See also Airline Stewards & Stewardesses Ass'n v. American Airlines, Inc., 7 Cir., 1978, 573 F.2d 960, 964; Cotton v. Hinton, 5 Cir., 1977, 559 F.2d 1326; EEOC v. American Telephone & Telegraph Co., 3 Cir., 1977, 556 F.2d 167; Patterson v. Newspaper & Mail Deliverers' Union, 2 Cir., 1975, 514 F.2d 767. The inquiry of the district court should focus on the terms of the settlement, considering the merits only insofar as they are relevant in determining the probable outcome of the litigation, and thus give some indication of the fairness and justice of the settlement. As stated by the court in Florida Trailer & Eqpt. Co. v. Deal, 5 Cir., 1960, 284 F.2d 567, 571, what was properly before the district court was "in the light of the charge and countercharge made in the . . . suit . . . was the proposed settlement a reasonable evaluation of the risks of litigation?"
 
 
 21
 Unless we can say that the district court abused its discretion in approving the Agreement, we will not overturn the district court's judgment. The findings of the district court were adequate to support a belief that were the matter fully litigated it is probable that plaintiffs would prevail and relief would be appropriate.
 
 
 22
 These principles are well exemplified in this case. Here, the Assistant Policewomen gave up the possibility of back pay and full seniority retroactive to their initial appointments to the police department in exchange for the certainty of receiving police officer positions with modified retroactive seniority upon successful completion of police officer training. San Jose gave up the possibility of prevailing completely on the merits in exchange for the granting of some relief to plaintiffs but without the risk of an obligation for back pay.
 
 
 23
 Nor did the district court ignore the inquiry mandated by Mandujano, supra, into the effects on incumbent employees of the retroactive seniority provisions of the settlement. See also Teamsters, supra, 431 U.S. at 371-376, 97 S.Ct. at 1872-1875.
 
 
 24
 While the effect of the Agreement on incumbent employees must be considered, it is well established that some effects on the seniority of incumbent employees are justified in order to achieve the goals of Title VII. Franks v. Bowman Transportation Co., 1976, 424 U.S. 747, 774-779, 96 S.Ct. 1251, 1268-1271, 47 L.Ed.2d 444. Moreover, the burden was on the Association to demonstrate some "unusual adverse impact" which would justify denying seniority relief. Id. at 779 fn. 41, 96 S.Ct. at 1271 fn. 41. This the Association did not do.
 
 
 25
 The district court assured itself that, under the Agreement, no existing employees would lose their jobs and that the number of returning employees was small enough that their impact on the seniority-based benefits of incumbent employees would be minimal. These findings are supported by substantial evidence. The district court therefore did not abuse its discretion in approving the Agreement.
 
 
 26
 III. Appropriateness of Retroactive Seniority Antedating Effective Date of Act.
 
 
 27
 The Agreement provides each of the Assistant Policewomen with seniority as of the date that she became one. For some of the Assistant Policewomen this seniority date is earlier than the effective date of the Act. The Association challenges the granting of this seniority relief as beyond the power of the court, claiming that Teamsters, supra, limits a Title VII grant of retroactive seniority to the date of application of the Act, which for public employers was March 24, 1972.
 
 
 28
 The Court stated in Teamsters, supra, that "no person may be given retroactive seniority to a date earlier than the effective date of the Act." 431 U.S. at 356-357, 97 S.Ct. at 1865. The logic implicit in this statement is that the "make whole" relief approved in Franks v. Bowman Transportation Co., Inc., supra, as a remedy for Title VII violations is only intended to restore an employee to the position he or she would have been in but for the illegal discrimination alleged. For private employers, such as those involved in Franks and Teamsters, discrimination was not illegal before the Act; thus the effective date of the Act limits the scope of the remedy available.
 
 
 29
 In this case, however, the employer involved a city is not a private employer. Before March 24, 1972, San Jose, because it is a city, was under an affirmative duty imposed by the equal protection clause of the Fourteenth Amendment and the Civil Rights Act of 1871, 42 U.S.C. § 1983, not to engage in purposeful discrimination against women. See Hazelwood School District v. United States, 1977, 433 U.S. 299, 309, 310 n. 15, 97 S.Ct. 2736, 2743 n. 15, 53 L.Ed.2d 768; Blake v. City of Los Angeles, 9 Cir., 1979, 595 F.2d 1367, 1383-1385.
 
 
 30
 To withstand scrutiny under the equal protection clause "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." Craig v. Boren, 1976, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397. The Supreme Court has repeatedly condemned distinctions made between men and women based on "archaic and overbroad generalizations," "old notions," and "role typing." Califano v. Goldfarb, 1977, 430 U.S. 199, 207, 211, 97 S.Ct. 1021, 1027, 1029, 51 L.Ed.2d 270. The job classification found here would not withstand such scrutiny. See Blake, supra, 595 F.2d at 1384. The requisite intent to discriminate existed also. The district court found that the evidences of pre-1972 discrimination "normally do not happen in the absence of intent." This finding justifies the pre-March 24, 1972 relief.
 
 
 31
 Nothing in Teamsters restricts the availability of Title VII seniority relief in this case pre-dating March 24, 1972. There, the Court was protecting the lawfully obtained seniority status of incumbent employees of private employers. The legislative history of the Act shows an intent to protect seniority acquired through the operation of lawful, albeit discriminatory, practices. See 431 U.S. at 349-355, 97 S.Ct. at 1861-1864. That is not what we have here.
 
 
 32
 The legislative history of the Equal Employment Opportunity Act of 1972, which extended Title VII to state and local governments, indicates a congressional intent to supplement the existing rights and remedies of public employees. The House and Senate reports explain that, although employment discrimination by public employers was already unlawful, public employees needed the protection of more accessible administrative remedies. Title VII was meant, therefore, to create an additional remedy to redress discrimination that was already unlawful. House Report No. 92-238, 92d Cong., 1st Sess. at 17-19 (1971). We therefore cannot presume that Congress intended that the courts should ignore the unlawfulness of a public employer's prior conduct and thereby sanction the withholding of remedial relief for unlawful acts occurring before March 24, 1972. The district court did not err in approving a settlement of which retroactive seniority to the date each plaintiff became an assistant policewoman was a part.
 
 
 33
 IV. The Assistant Policewomen's Claims Against the Association.
 
 
 34
 The Assistant Policewomen claim that (1) the Association, as exclusive bargaining agent for police personnel in San Jose, breached its duty to them of fair representation; (2) the Association discriminated against them in violation of Title VII; (3) the Association violated the Equal Pay Act, 29 U.S.C. § 201 et seq., as to them; and (4) the Association, as to them, violated the nondiscrimination clause of its negotiated contract with San Jose.
 
 
 35
 The district court dismissed these claims against the Association for failure to show a right to relief on the facts presented and the law under Fed.R.Civ.P. 41(b). In so doing, the court made findings of fact and conclusions of law under F.R.Civ.P. 52(a). This was proper in this non jury case, and in reviewing the decision, we apply the "clearly erroneous" rule mandated by Rule 52(a). See also Rutledge v. Electric Hose and Rubber Co., 9 Cir., 1975, 511 F.2d 668, 676; Shull v. Dain, Kalman & Quail, Inc., 9 Cir., 1977, 561 F.2d 152.
 
 
 36
 After making findings of fact, the district court found and concluded that:
 
 
 37
 (1) the Association did not owe the Assistant Policewomen a duty of fair representation; if it did owe such a duty, no breach was shown, and administrative remedies available and necessary to claim such a breach had not been exhausted, causing the claim to be improperly presented;
 
 
 38
 (2) the Association did not violate Title VII;
 
 
 39
 (3) the Association did not violate the Equal Pay Act. The jobs of assistant polcewomen and police officer were not substantially similar and no action by the Association to cause unequal pay was shown;
 
 
 40
 (4) The Assistant Policewomen failed to show that the Association violated the nondiscrimination clause in the negotiated contract between the Association and San Jose.
 
 
 41
 The conclusions of the district court are supported by its findings of fact, and its findings are not clearly erroneous.
 
 
 42
 V. Applicability of the Statute of Limitations.
 
 
 43
 The Association claims that both the Assistant Policewomen's request for approval of the Agreement and their ancillary claims against the Association are time-barred because none of the acts of discrimination alleged occurred within the time limitations in 42 U.S.C. § 2000e-5: "(a) charge . . . shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . ." (as the statute then read)Because we find that the district judge properly dismissed the claims of the Assistant Policewomen against the Association for failure to show a right to relief on the facts presented and the law, under Fed.R.Civ.P. 41(b), we need not decide whether these claims would have been time-barred.
 
 
 44
 In addition to finding specific acts of discrimination by San Jose, the trial judge also found that those acts were of a continuing nature. These findings are supported by the record. A pervasive policy of systematic discrimination is a continuing violation of Title VII. Reed v. Lockheed Aircraft Corp., 9 Cir., 1980, 613 F.2d 757, 760 (1980). The period of limitation would not start until the time when the policy was discontinued. When continuing discrimination is involved, as it was here, an action on the merits is not time-barred (Id. at 761). Therefore an action to approve a settlement agreement based on the same policy is not time-barred. We need not and do not decide here whether an action to approve a settlement agreement would be barred by the statute of limitations if an action on the merits were so barred; however, there is authority to suggest that the nature of settlement proceedings would prevent such a bar. See Airline Stewards and Stewardesses Ass'n v. American Airlines, Inc., supra, 573 F.2d at 963.
 
 
 45
 VI. Attorneys' Fees.
 
 
 46
 The district court held that "each party is to bear its own attorneys' fees, as no party is the prevailing party as it must be under 42 U.S.Code 2000(E)(5) (2000e-5), subparagraph K." The relevant section, also referred to as Title VII, § 706(k) states:
 
 
 47
 (k) In any action or, proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.
 
 
 48
 The award of attorneys' fees is a matter committed to the discretion of the trial judge. See Fountain v. Safeway Stores, Inc., 9 Cir., 1977, 555 F.2d 753; Van Hoomissen v. Xerox Corp., 9 Cir., 1974, 503 F.2d 1131. The Assistant Policewomen have not shown us any abuse of discretion by the trial judge.
 
 
 49
 Affirmed.
 
 
 
 *
 The Honorable Robert A. Grant, Senior United States District Judge for the Northern District of Indiana, sitting by designation
 
 
 [1]
 The named plaintiffs are fourteen of the fifteen women employed as assistant policewomen by the City at the time the trial judge rendered his decision. The remaining assistant policewoman chose not to take part in the action, and two of the named plaintiffs had decided not to take advantage of the terms of the Agreement at the time the decision was rendered. All fifteen women signed the Agreement
 
 
 [2]
 Why is it that women seeking equal rights object to such words as man, men, mankind, he, him, his, but do not object to female or male? Why should opposition to discrimination against women become a weapon for turning the wonderful language of Shakespeare and Milton into a hideous parody of itself? In the opening brief of the appellant-plaintiffs, we find locomotive firemen called "firefighters," and railroad brakemen called "brakepersons." Whatever else locomotive firemen or firewomen may be, they most assuredly are not firefighters. And who ever heard of a brakeperson? A broken person, perhaps, but never a brakeperson! If we are talking about a woman, why not a brakewoman, or even a woman brakeman?
 
 
 [3]
 The customary maximum age limitation, the written and oral exams duplicative of those required to become an ID officer and an assistant policewoman, and the entry-level medical examination were waived. The educational requirement was modified to allow the women to acquire the requisite college credits after their appointment as police officers. The women were required to complete successfully the physical agility test which initial applicants for police officer positions were required to pass but which police officers, once appointed, were not required to take again
 
 
 [4]
 The court also noted that current police officers are not required to pass the physical agility test after their appointment and "the evidence indicates that some of them, at least, would have difficulty passing it." The plaintiffs are still required to acquire the college credits within a specified time after appointment and testimony suggested that having the credits "does not necessarily make you more adept at doing your job as a police officer."